Cheshire,　}
March 1, 1904. }

### BIGELOW & a. v. WHITCOMB & a.

Trees standing within the limits of an ancient public highway, upon land not required for the accommodation of actual travel, are the property of the adjacent owner, who cannot be deprived of his right therein without compensation, after a legal hearing.

A landowner who removes trees which stand within the limits of an adjacent highway, and which have been designated by the town authorities for the purpose of shade and ornamentation, is not liable to the penalty prescribed by section 8, chapter 98, Laws 1901, unless his property right has been divested in the manner provided by section 3 of that act.

DEBT, by the tree wardens of the town of Hinsdale, to recover a forfeiture for cutting certain trees growing within the laid-out limits of a highway in the town, and designated by the plaintiffs in the manner required by law, for the purpose of shade and orna-

mentation. The defendants, who are owners of the adjoining land, pleaded title in the trees. Facts found by a referee, and case transferred from the October term, 1903, of the superior court by *Pike*, J.

In January, 1902, the plaintiffs designated the trees in question for shade and ornamentation, as provided in chapter 98, Laws 1901. No compensation was tendered to the defendants by the plaintiffs for the trees. In the following March, the defendants cut down the trees.

*John E. Allen, Charles H. Hersey,* and *Streeter & Hollis,* for the plaintiffs.

*Cain & Benton* and *Mitchell & Foster,* for the defendants.

WALKER, J. This action is brought under chapter 98, Laws 1901, relating to the protection and preservation of ornamental and shade trees in highways. It provides (*s.* 1) that one or more tree wardens shall be appointed by the mayors of cities and the selectmen of towns; (*s.* 2) that " towns and cities shall have control of all shade and ornamental trees situated in any public way or ground within their limits, which the tree warden deems reasonably necessary for the purpose of shade and ornamentation; and it shall be the duty of the tree wardens, as soon as possible after their appointment, to carefully examine the trees situated as aforesaid, and to plainly mark such trees as they think should be controlled by their municipality, for the purposes aforesaid, by driving into each tree, at a point not less than three nor more than six feet from the ground, on the side toward the highway, a nail or spike, with the letters ' N. H.' cut or cast upon the head. . . . They shall also have the power to designate from time to time, in the same manner as hereinbefore directed, such other trees within the limits of the public ways and grounds as in his [their] judgment should be preserved for ornament or shade "; (*s.* 3) that " if any of the trees designated as aforesaid should prove to be private property, and the owners thereof refuse to release or convey their interest therein to the municipality, the tree warden shall acquire them for the use of the city or town by purchase, if it can be done at a fair price. Failing in this, he may, on petition for that purpose, acquire them in the same way and manner, and with the same right of appeal to their owners, as in the case of land taken for a highway "; (*s.* 4) that towns and cities may appropriate money " to be used by the tree warden in planting, pruning, protecting, and, whenever necessary, acquiring shade and ornamental trees within the limits of their public ways and grounds "; (*s.* 5)

that such trees shall not be removed except after a public hearing, etc.; (s. 6) that "it shall be unlawful to cut, destroy, injure, deface, or break any public shade or ornamental tree"; and (s. 8) that "persons violating any of the provisions of this act shall forfeit not less than five nor more than one hundred dollars, to be recovered in an action of debt by the tree warden."

It is apparent that the legislature in enacting this statute recognized that there might be a private ownership in trees located within the limits of highways, and provided the means by which such private ownership might be legally terminated by the public upon due compensation therefor.  *McCarthy* v. *Boston*, 135 Mass. 197, 200.   No attempt is made to authorize the warden to appropriate trees standing in the highway, without a hearing and compensation, unless they are public property.   Private property in such trees, when it exists, is fully protected.   Hence the question in this case is, not whether the statute is constitutional, but whether the plaintiffs, as tree wardens, have observed the statute in attempting to appropriate the trees in question to the public use of shade and ornamentation.   Their proceedings in the premises have been based entirely upon the theory that the trees were not private property, and that the defendants had no legal rights thereto; in other words, that the trees were public property, for the greater protection and preservation of which it was only necessary that they should be marked in the prescribed way.

It is assumed, in the absence of a finding to the contrary, that the trees in question stood on the side of a country road and that their ownership was not peculiar, but depended upon the legal effect of the laying out of ancient highways upon the property rights of the landowners.   If when the highway was laid out the public acquired the right, not only to construct and maintain a road over the land and to pass and repass thereon, but the right to deprive the landowner of the natural growth upon the side of the traveled path, whenever a later public sentiment might require it for ornamentation or comfort, the landowner's title to such growth is not an absolute one, and the public may terminate his limited and qualified right at pleasure and without further compensation. And it is the plaintiffs' contention that from the time when the highway was laid out, early in the last century, until they marked the trees, as provided in the statute, in 1902, the defendants, or their ancestors in title, might have legally cut down the trees and used the logs and wood for their own purposes, by virtue of their ownership of the adjoining land; but that after the trees were designated by the tree wardens for shade and ornament, their right to appropriate them as their property ceased or was in abeyance, by virtue of an original right which was vested in the public when

the highway was laid out. This theory might not be inaccurately stated to be that the public acquired the right to use the natural growth of the land, with a permissive right in, or license to, the abutter to use and consume it, until such time as the public might indicate its desire to use it for some highway purpose. On the other hand, it is denied that the public acquired any right to the products of the soil, as the grass and trees naturally growing thereon, except to remove them from the ground when necessary for the convenience or safety of public travel over the way; and that so long as they do not constitute an obstruction or menace to travelers, the abutter has an absolute right to have them grow there and an equally unlimited right to remove them.

It is a general principle which is not controverted in this case, that, " in highways laid out through the lands of individuals in pursuance of statutes, the public has only an easement, a right of passage; the soil and freehold remain in the individual, whose lands have been taken for that purpose." *Makepeace* v. *Worden*, 1 N. H. 16. And it was held in that case, that if surveyors of highways, in making or repairing roads, cut and convert to their own use wood growing thereon, they are trespassers. " The right acquired by the public in a highway legally established for the public use is only that of an easement; a right of passage over the land. . . . This right consists in the power to make the road and to keep it in repair suitable for travel, and in its free use by the public for all proper purposes, until discontinued. In making or repairing highways, however, nothing can be taken from the land over which they are laid, by the town authorities, for any purpose except the legitimate end of constructing the roads. Everything growing or standing upon the land, the trees, timber, &c., belongs to the owner; and everything that goes to form the land itself also belongs to him, except what is necessary to be actually used in the making or repairing of the highway." *Rowe* v. *Addison*, 34 N. H. 306, 311, 312. See, also, *State* v. *New Boston*, 11 N. H. 407, 409; *Troy* v. *Railroad*, 23 N. H. 83, 93; *Blake* v. *Rich*, 34 N. H. 282; *Graves* v. *Shattuck*, 35 N. H. 257; *Winchester* v. *Capron*, 63 N. H. 605; *Bailey* v. *Sweeney*, 64 N. H. 296; *Perley* v. *Chandler*, 6 Mass. 454, 456; *Jackson* v. *Hathaway*, 15 Johns. 447, 453. " The owner of the land, therefore, retains his title in trees, grass, growing crops, buildings, and fences standing in the highway at the time of the laying out (unless he fails to remove them within a reasonable time after notice to do so), as well as in any mines or quarries beneath, which are not part of the surface of the earth upon and of which the highway is made." *Denniston* v. *Clark*, 125 Mass. 216, 221. " He owns the trees growing upon it, and may maintain trespass against any one cutting them, or gathering

their fruit, or for any other invasion of his possession. But of course the proper public guardians of the highway may cut down any trees which are a permanent obstruction to the use by the public of any part of the highway." Jones Ease., *s.* 479 ; *Turner* v. *Highway Board*, L. R. 9 Eq. 418.

In *Baker* v. *Shephard*, 24 N. H. 208, it was held that by the laying out of a highway the public acquire no right to use the trees growing upon the land to build or repair the road. In the opinion of the court Judge *Bell* says (*p.* 215) : "The question is, whether the trees growing upon the land laid out for a highway are all to be deemed materials subject to the same rules as sand, gravel, &c., liable to be cut down at the discretion of the agent for building the road, and to be used for the repairs of the road. If they are not, then the question is whether the agent or surveyor has a right to cut down any trees growing in the highway land, except such as it is necessary to cut down and remove for the purpose of building and repairing the road in a reasonable and proper way ; and whether the trees properly cut down for this purpose can be deemed materials, and applied, at the pleasure of the agent or surveyor, to the construction or repair of the traveled way." After showing the difficulty of assessing damages occasioned by the acquisition by the public of such rights in trees growing by the side of a highway, he proceeds (*p.* 217 ) : "The appraisal must have been made of the trees as they were. Their increased size and value is derived from their being permitted to occupy and draw their nourishment from the soil of the landowner, to the profits of which, subject to the public easement, he is exclusively entitled. Can the trees be taken and applied to the public use without allowing him anything for their increased value ? For how many years may the public leave the trees, in which they are supposed to have a right, to grow upon the highway, and thus deprive the owner of the profits of his land ? It is this circumstance, that the increase of growing timber makes a part of the natural profits of the soil, which marks a clear line of distinction between trees and the inanimate sand and gravel, which are always materials liable to be used upon the highways." And he concludes that the only right the public " acquire in relation to such trees, is that of cutting down and removing to a convenient distance, for the use of the owner, such trees as it is necessary to remove in order to the making or repair of the road in a proper and reasonable manner. In this conclusion we are supported by the ancient authorities."

A similar result was reached in *Tucker* v. *Eldred*, 6 R. I. 404, where it was held that, in opening a new highway or amending an old one, the town sergeant or surveyor may under the law remove

growing trees or brushwood from the space appropriated to the highway, but has no right, as included in the original assessment of damages or the easement of the public, to use such trees or underbrush in the building or amendment of the roadway ; and that if he does so use them, he becomes a trespasser.  In *Suffield* v. *Hathaway*, 44 Conn. 521, it was held that the selectmen of a town have no right, as against the owner of land on the highway, to divert the water from a spring on such owner's side of the road to a public watering-trough on the other side.  The court say : " As between the public and the respondent, the owner of the spring, the latter is entitled to any and all uses of it which do not interfere with the public safety, do not obstruct or hinder public travel, and do not increase the public burden of making repairs.  .  .  . The right of the owner to the use of the spring under these limitations takes precedence of the right of the officers to divert it to the lands of others, if in so doing their sole motive is to establish a public watering-place.  Of course, such places afford great relief to man and beast ; but commendable as is the act of establishing them, towns have no right to take private property without compensation for that purpose."  In *Deaton* v. *County*, 9 Ia. 594, the question arose upon an assessment of damages in the laying out of a highway, the plaintiff claiming that he was entitled to compensation for timber growing in the highway ; but the court held that his title to the trees was not divested or affected by the condemnation proceedings.  For the same reason, it has been held that the public acquire no right to remove stones embedded in the ground below the grade of a highway and to use them in repairing the road.    *Winter* v. *Peterson*, 4 Zab. 524 ;  *Rich* v. *Minneapolis*, 37 Minn. 423 ;  *Overman* v. *May*, 35 Ia. 89, 97 ;  7 Geo. III, *c.* 42, *s.* 3 ; 13 Geo. III, *c.* 78, *ss.* 16, 27.

On the other hand, it was decided in *Felch* v. *Gilman*, 22 Vt. 38, that the highway officers may use trees growing in the highway in repairing the road ; but the reasoning of the court is not so convincing as to warrant a re-examination of the decision in *Baker* v. *Shephard*, *supra*, or to weaken the force of the numerous authorities to the contrary.    *Phifer* v. *Cox*, 21 Ohio St. 248, 255.

Upon this examination of the authorities, the question is presented whether, in laying out a highway under statutory authority, the public acquire a right to prohibit the landowner from removing the trees standing in the highway next to his land, for the purpose of preserving them for shade and ornamentation.    If the public cannot deprive the owner of his trees by using them in constructing or repairing the road, can they deprive him of his property right in them by preventing him from cutting them down and using them in such a manner as he sees fit?    It is no more a dep-

rivation of his property right to cut down his trees and devote them to the useful and necessary work of road construction, than it is to appropriate them standing, for the purposes of shade and ornamentation. An effective prohibition against one's use and enjoyment of his property in a usual and otherwise appropriate manner deprives him of his property, as much as its actual taking or asportation against his will. *Eaton* v. *Railroad*, 51 N. H. 504, 511, 512. By the act of the plaintiffs, if valid, the de endant's common right to remove the trees is destroyed,—his right of user is materially curtailed,—and his property is taken. " Before the public can assume to say that a man cannot cut down his own trees, they must have acquired an interest therein by purchase or by the right of eminent domain. To prevent a man from using his property is virtually taking it from him, to a certain extent; and this cannot be done without compensation." *Lancaster* v. *Richardson*, 4 Lans. 136, 141. Moreover, the additional servitude is imposed upon the owner's land of supporting the trees for a public purpose. Their future growth and nourishment is to be derived from his soil. He is not only deprived of the valuable right to convert the trees into lumber and wood, which may be called the natural profits of the land, but he must allow the trees to remain upon the land and draw their sustenance therefrom. If he desires to cut off the branches of fruit trees standing on his side of the highway (*Stackpole* v. *Healy*, 16 Mass. 33, 36), for the purpose of grafting them and thus of increasing his income from the land, he is met with the refusal of the public to allow the arboreal symmetry of the road to be thus impaired. He finds that his right of property in the trees is practically superseded by the public right of preserving them for shade, or ornament, or both.

If such a right was acquired when the road was originally laid out, and if damages were assessed therefor, the statutes authorizing the laying out of highways furnish little convincing evidence. in support of that contention. By the act of February 8, 1791, it was enacted: " That at any time hereafter, when there shall be occasion for any new highways or private roads, to be laid out in any town or place in this state, the selectmen of such town or place be, and hereby are, empowered, on application made to them, if they see cause, to lay out the same; . . . and if such road be for the benefit of the town or public, due recompence shall be made by the town to the owners of land through which such road is laid out, for all damages such owners sustain thereby." Laws, *ed.* 1792, *p.* 278 ; *ed.* 1797, *p.* 309 ; *ed.* 1805, *p.* 328 ; *ed.* 1815, *p.* 385.

The first section of the act of July 3, 1829, is a re-enactment of the first part of the statute above quoted, with some additions not material to the present inquiry, while section 2 provides: " That

when the selectmen of any town shall lay out a highway, they shall make return thereof, in which the way shall be particularly described and the width thereof stated, and shall cause the same to be recorded by the clerk. And such selectmen shall assess the damages thereby sustained by the owners of the land, and shall insert in the record the sums so assessed." Laws 1829, *c.* 52. In the Revised Statutes (*c.* 49, *s.* 13) and in the Compiled Statutes (*c.* 52, *s.* 16) the language used is, that "such selectmen shall assess the damages sustained by each owner of the land required for such highway, and insert the same in their return." In the revision of 1867, it is provided that the selectmen "shall assess the damages sustained by each owner of the land or other property taken for such highway, and insert the same in their return." G. S., *c.* 61, *s.* 15. This language also occurs in the General Laws (*c.* 67, *s.* 19) and in the Public Statutes (*c.* 67, *s.* 18). In the highway legislation of the state no attempt appears to have been made to state specifically the property right taken for highways, or the elements of the damages sustained by the landowner. But the court has frequently been called upon to define the extent of the power conferred for which damages are assessable, and the rights retained by the landowner for which he is not entitled to damages. In 1816, it was decided in *Makepeace* v. *Worden, supra,* that the public have only a right of passage in highways; that is, an easement only. In 1827, a similar holding was announced in *Avery* v. *Maxwell,* 4 N. H. 36. The decision in *Baker* v. *Shephard, supra,* was announced in 1851, to the effect that the public did not acquire, by the laying out of a highway, a right to use the timber growing thereon for its construction or repair. These decisions, and others of a similar import, give a restricted interpretation to the language of the legislature authorizing the taking of private property for highway purposes (Ang. High., *s.* 83), and have been recognized by successive legislatures without any substantial modification. The legislative intention in these respects having been determined so long ago, and acted upon for so many years, cannot now be treated as an open question. The general principle underlying these decisions seems to be that the landowner was deprived of such rights only, and was paid for such rights only, as were reasonably necessary for the construction and maintenance of a way for public travel. "The compensation originally paid him for the taking of land for the road was computed upon the basis that the road would be built in a manner suited to the then existing circumstances." *Hinckley* v. *Franklin,* 69 N. H. 614, 615.

No logical argument in favor of the plaintiffs' contention can be drawn from the undoubted fact, that upon the laying out of a

highway under the statute the public acquire the right to use the soil within the limits of the way for its construction and repair, and thus to deprive the owner of the profits of the land, which he might otherwise enjoy. As was shown in *Titus* v. *Boston*, 149 Mass. 164, 165, 166: "It has from the earliest times been the practical construction of our laws authorizing land to be taken for public use, that the towns or corporations had the right, as one of the incidents of the taking, to use the gravel or soil of one part of a way for the construction of another part." See, also, *Denniston* v. *Clark*, 125 Mass. 216, 222, 223; *New Haven* v. *Sargent*, 38 Conn. 50. The practically universal understanding and construction of the public right to use the soil of the way, for more than a hundred years, is evidence of great force upon the question whether it was in fact acquired and paid for when the way was laid out; and for a similar reason, the fact that, anciently, arboreal shade and ornamentation of rural highways was not deemed a matter of much importance, is equally strong evidence that the public, by laying out a highway, did not acquire a right to compel the abutter to suffer his trees to remain for that purpose. The evidence of such an intention is wanting. "The *locus in quo*, although part of a turnpike road, is the soil and freehold of the plaintiff. He has the exclusive right of property in the land, subject, however, to the easement or rights incident to a public highway, such as the right of passage over it, and the right which the turnpike corporation has to construct a convenient pathway and to keep it always in good repair. To accomplish these purposes, the corporation may dig up and remove from place to place, within the limits laid out for the road, any earth, sand, and gravel, and may dig or cut up sods and turf; but it by no means follows that the corporation has the right of herbage, which is the exclusive property of the owner of the soil, as well as all trees, mines, &c." *Adams* v. *Emerson*, 6 Pick. 57, 58; *Bailey* v. *Sweeney*, 64 N. H. 296; *Cole* v. *Drew*, 44 Vt. 49.

If the public highway easement for travel and communication authorizes the construction and operation, either on, above, or below the road-bed, of horse, electric, or steam railways, without the consent of the adjacent landowners whose title extends to the center of the way (*Pierce* v. *Drew*, 136 Mass. 75; *Sears* v. *Crocker*, 184 Mass. 586), it does not follow that a right to appropriate the natural profits of that part of the way which is not actually used for travel, to the public use of ornamentation of rural highways, was originally taken and paid for. The right to use the way for public travel may include the right to use it in all reasonable ways for the convenient accomplishment of that purpose; but it is an unwarranted inference to say that it also includes a right to use

property for the æsthetic purpose of highway ornamentation, which had never before been deemed a constituent part of the road for travel, and which could not even be used in repairing the road-bed. *Johnson* v. *Railroad*, 35 N. H. 569, 572. The kind of vehicles the public use in passing over the way may not determine the question of the right of passage; the right under the easement may justify the use of many modes of conveyance of which the men who laid out the way had not, and could not have had, the slightest conception. But property, like trees standing in the highway, which had no useful connection with the public passage over the way, and which when constituting an obstruction to such passage was necessarily removed as a nuisance, cannot be deemed to have been taken at the laying out of the road. If it had been taken and used for some public highway purpose, it may be it could have been subsequently used for a somewhat different public purpose. Trees and herbage in the highway, which do not interfere with, or obstruct, the public use of the road and which are the natural profits of the unused land, were not taken, because they were not needed for highway purposes. Hence they cannot now be used by the public without compensation to the owner. 3 Kent 433; *State* v. *New Boston*, 11 N. H. 407, 409; *Perley* v. *Chandler*, 6 Mass. 454, 456; *Woodruff* v. *Neal*, 28 Conn. 165; *Overman* v. *May*, 35 Ia. 89, 97.

The idea of providing for the shade and ornamentation of highways is of comparatively modern origin. It does not seem to have commanded the attention of the people in the early part of the last century. In 1858, the mayor and aldermen of Portsmouth were "authorized to set out and maintain trees and shrubbery on public squares and highways at the expense of the city" (Laws 1858, *c.* 2128, *s.* 1), and the next year similar authority was conferred on the mayor and aldermen of Dover. Laws 1859, *c.* 2258. In 1861, a general statute was passed for the preservation and protection of shade trees, which provided: [*s.* 1] "That any town or city shall have full control of the shade trees situated within the limits of any public street or highway in, or passing through any town or city; and shall have full power to make such laws, from time to time, as may be deemed necessary for the protection and preservation of the same. [*s.* 2] If the owner of real estate in any town or city shall desire to remove any shade tree or trees, situate between the carriage path and sidewalk, or within the limits of any public street, he shall obtain leave of the selectmen of the town or mayor and aldermen of the city wherein the trees may be located, or conform to laws which the town or city may have provided relative to shade trees. [*s.* 3] Nothing in the foregoing shall be construed to debar the owner of real estate to plant, rear,

and protect any tree or trees between the carriage path and sidewalk in any public street or highway on which his estate be situate, if it do not interfere with the public travel." Laws 1861, c. 2502; G. S., c. 34, ss. 9, 10, 11. It will be observed that these provisions recognize the property right of the abutter in the shade trees in the highway, subjecting them merely to certain regulations as to their removal. No attempt was made to deprive him of his ownership of the trees. By section 6, chapter 1, Laws 1868, towns were authorized to raise money for the planting of shade trees; and in 1875, such an abatement of taxes was authorized, "to any person who shall set out and protect shade trees by any street or highway adjoining his land, as the said mayor and aldermen or selectmen shall deem just and equitable." Laws 1875, c. 39, s. 2; G. L., c. 37, ss. 9, 10, 11; Laws 1889, c. 82. These statutes were embodied in the Public Statutes (c. 40, ss. 4, 9, 10, 11) without any material change. In 1895, it was enacted that the mayor and aldermen of cities and the selectmen of towns be authorized "to designate and preserve trees standing and growing in the limits of highways, for the purposes of shade or ornament," and that "whoever shall wantonly or intentionally injure or deface any trees thus designated . . . shall forfeit not less than five nor more than one hundred dollars." Laws 1895, c. 85. At the next session, the legislature authorized selectmen to set out nursery trees which might be presented to them, in such highways as the donor should indicate, but provided that "nothing in this act shall be construed to compel any party to have trees in the highway on the side next his land without his consent." Laws 1897, c. 44.

From this examination of legislation previous to the act of 1901, it is apparent that it was no part of the legislative purpose to deprive abutters on highways of their property in the trees growing therein, but to more effectually guard and preserve such trees (*Chase* v. *Lowell*, 149 Mass. 85), so long as they were permitted to remain in the highway. The provision in section 2, chapter 98, Laws 1901, that "towns and cities shall have control of all shade and ornamental trees situated in any public way or ground within their limits," was not intended to have a more extensive meaning, or to be more expressive of the purpose to appropriate private property to a public use, than language of similar import used in section 1, chapter 2502, Laws 1861, where the rights of abutters on highways were recognized and protected. The legislature has thus furnished evidence of a public policy based on an assumption or recognition of the fact that in laying out highways the abutter retained his property in the trees therein, which, not being obstructions, were allowed to stand in the untraveled part of the way.

This practical, contemporaneous construction of the rights of the landowner is evidence of great weight upon the question whether the public acquired the right, when the way was laid out, to terminate at any subsequent time his proprietary dominion of trees in the highway. That such a power has not been directly recognized in the legislation upon the subject, which is readily susceptible of a construction excluding its existence, is a very significant evidentiary fact.

Whether a different result might not be reached in the case of the laying out of a street in a city or populous community, where all the land taken is required for actual, present use (2 Dill. Mun. Corp., s. 608; *Boston* v. *Richardson*, 13 Allen 146, 159; *Bloomfield etc. Co.* v. *Calkins*, 62 N. Y. 386; *Chesapeake etc. Co.* v. *Mackenzie*, 74 Md. 36, 47), it is unnecessary to consider; for it seems plain that trees growing by the side of an ancient rural highway, upon land not required for the accommodation of actual travel, belong to the owner of the adjacent land, who cannot be deprived of his right as owner without compensation, after a legal hearing. *Winchester* v. *Capron*, 63 N. H. 605. Whether the trees are useful for shade and add to the beauty of the way, or whether they are only useful for lumber and wood, cannot determine the question of his ownership. If they are his property, he is entitled to the beneficial use of them, subject to such reasonable regulations as the public use of the highway may require. *White* v. *Godfrey*, 97 Mass. 472, 475; *Bliss* v. *Ball*, 99 Mass. 597; *Clark* v. *Dasso*, 34 Mich. 86; *Bills* v. *Belknap*, 36 Ia. 583; *Everett* v. *Council Bluffs*, 46 Ia. 66. But to permanently deprive him of the beneficial use of his property, or of the profits or income usually derivable therefrom, is not a reasonable regulation, but is an extinction of his right without corresponding compensation, and amounts to confiscation. As this proceeding is based upon the theory that the defendants had no right, under any condition, to cut down the trees in question,—in effect, that their property right in the trees had been legally divested and fully paid for,—and as the plaintiffs have not proceeded to divest the defendants of their title in the manner pointed out in section 3 of the act, the result is that the prosecution cannot be maintained.

*Case discharged.*

All concurred.